IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL CASE NO. |
| | 1:11-cr-00434-TCB-RGV |
| VERNANDO SEALS | |

**MAGISTRATE JUDGE'S FINAL REPORT,
RECOMMENDATION, AND ORDER**

Defendant Vernando Seals ("Seals"), along with co-defendant Gregory Louis ("Louis"), has been charged in a three-count superseding indictment with (1) conspiracy to commit bank fraud and to convert to their use, and the use of others, money and a thing of value of the United States having a value of more than $1,000, in violation of 18 U.S.C. § 371; (2) bank fraud in violation of 18 U.S.C. §§ 1344 and 2; and (3) theft of government property in violation of 18 U.S.C. §§ 641 and 2. [Doc. 20].[1] Pending before the Court is Seals' motion to suppress statements. [Doc. 40]. Following an evidentiary hearing on March 14, 2012, on Seals' motion to suppress,[2]

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[2] See [Doc. 55] for a transcript of the evidentiary hearing. Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)." In addition, the parties each submitted an exhibit during the hearing, which will be

the parties filed post-hearing briefs, [Docs. 60, 61, & 64], and the pending motion is now ready for ruling. For the following reasons, it is **RECOMMENDED** that Seals' motion to suppress statements, [Doc. 40], be **DENIED**.[3]

## I. STATEMENT OF FACTS

On April 6, 2011, co-defendant Louis deposited a stolen United States Treasury check made payable to the City of Tuskegee in the amount of $60,000.00 into a business account for J.D. Motorcars, Inc., which Louis had fraudulently opened using the identity of Angelo Padin at a BestBank located in Lithonia, Georgia. [Doc. 20 at 2 ¶ 4, 3 ¶¶ 7-8, 4 ¶ 11]; (Tr. at 30 & Def. Ex. 1).[4] An investigation into this deposit revealed that Seals, who was working as a sales associate at BestBank, opened the fraudulent bank account for Louis on April 4, 2011, in return for a payment of $100.00, and then accepted deposit of the stolen check on April 6, 2011, without receiving the proper approval of a supervisor. [Doc.

---

referred to as "(Gov. Ex. ___)" for the government's exhibit and ("Def. Ex. ___") for Seals' exhibit.

[3] Seals' initial post-hearing brief, [Doc. 60], has erroneously been docketed as a motion to suppress statements. The Clerk is **DIRECTED** to correct the docket to reflect that Document 60 is a brief in support of the motion to suppress, not a motion.

[4] Louis entered a guilty plea to Count One of the superseding indictment on January 19, 2012, see [Doc. 41], and he was sentenced on April 20, 2012, see [Doc. 59]. Thus, Seals is the only remaining defendant in this action.

20 at 2 ¶ 5, 3 ¶¶ 9-10, 4 ¶ 12]; see also (Tr. at 28-32). Seals now seeks to suppress statements he made during an interview conducted as part of the investigation that ultimately led to the superseding indictment being returned against him on December 13, 2011. See [Doc. 20].

On July 15, 2011, at approximately 1:00 p.m., Special Agent Steven Borders ("Agent Borders"), of the United States Department of Justice, Office of Inspector General, arrived at the BestBank, which is located inside of a Walmart store in Lithonia, Georgia,[5] to interview Seals as part of his investigation of "an issue involving a stolen U.S. Treasury check involving funds from the American Recovery and Reinvestment Act of 2009." (Tr. at 3, 5-6, 22-23, 41, 56, 74). Prior to interviewing Seals, Agent Borders met with William D. Raiford ("Raiford"), a Corporate Investigator for BestBank,[6] in the Walmart parking lot, and the two men entered the store together.[7] (Tr. at 6-7, 47, 55-56). Upon entering Walmart, Agent Borders, who

---

[5] BestBank is located at the front of the Walmart store, between the two entrances, where the customer service desk often is located. (Tr. at 7-8).

[6] Raiford is not a Special Agent, was not acting as a law enforcement officer, and does not carry a weapon in the course of his employment, but was solely present for Seals' interview to "handle any bank questions that may rise as it related to bank protocol," to provide general assistance if needed, and to act as a witness. (Tr. at 45-46, 48, 56, 58).

[7] Approximately one month prior to this meeting, Agent Borders had met with Raiford and he had provided Agent Borders with a physical description of Seals; copies of the documents used to open the account at issue, which showed that Seals

3

was dressed in business casual attire, went to the security office to inquire about an office in which to conduct the interview, while Raiford went directly to BestBank to ask to speak with Seals. (Tr. at 5, 7-8, 38, 41, 56). Shortly thereafter, Raiford and Seals met Agent Borders in front of the Walmart entrance just outside of the security office and they proceeded to walk to the back of the store. (Tr. at 8-9, 37).[8]

Once the three men reached the back of the store, they entered an office but found that it was too noisy due to computer servers that were located within it, and they were then given access to a second office in which to conduct the interview. (Tr. at 9, 37, 40, 57, 75). After they entered the second office, which was approximately eight feet by eight feet with a metal desk located along one wall and three chairs, Agent Borders sat beside the desk with his back against the wall, Seals sat at the desk on the same side as Agent Borders but closer to the door of the office,

---

was the teller who had opened the account for Louis; and a copy of the stolen check. (Tr. at 6-7, 27-32, 54, 62-63, 67-68 & Def. Ex. 1). Agent Borders had also spoken to Louis prior to his interview of Seals, and Louis had informed him that he had given Seals $100.00 for opening the account and depositing the check at issue and that he had received a call from Seals when the check did not clear. (Tr. at 34-35, 45).

[8] Agent Borders testified that he did not introduce himself or speak to Seals as they walked to the back of the store. (Tr. at 8-9, 37). Agent Borders had a firearm on his hip under his jacket that was not visible, though it may have become visible as he was walking, and while he did have on his badge, it likewise was not visible. (Tr. at 5-6). Agent Borders and Raiford also testified that as they walked to the back of the store, neither of them physically touched Seals, see (Tr. at 9, 38, 60); however, Seals testified that Raiford had his hand on his elbow and physically guided him through the Walmart store, see (Tr. at 75).

4

and Raiford sat in a chair that was located in the doorway that led to a closet or storage room within the office. (Tr. at 10, 40-41, 57-58, 75-77, 80).[9] The door to the office was closed but not locked. (Tr. at 10, 77).

After they were in the office, Agent Borders identified himself, showed Seals his credentials, advised him of the purpose of the interview, and asked him whether he would be willing to speak with him about the deposit of the stolen check, and Seals agreed to speak with him. (Tr. at 11-12, 33, 59-60, 77).[10] Agent Borders then proceeded to interview Seals and specifically asked him about the opening of the account at issue and the deposit of the $60,000 check. (Tr. at 12, 77).[11] Seals admitted that he had opened the account in question for Louis, that he had received compensation for opening the account and depositing the check, and that he had

---

[9] While Agent Borders and Raiford testified that Seals was seated closest to the door that led out of the office and that he had a clear path to the door, see (Tr. at 10, 44, 58), Seals testified that he would have had to walk past Raiford to get to the door and that he did not feel like he could leave, (Tr. at 77).

[10] At this time, Seals was not restrained in any way, was not threatened with arrest, and though neither Agent Borders nor Raiford advised him that he could leave at any time, they also never advised him that he had to speak with them. (Tr. at 11-12, 44, 57, 71, 76, 78). Moreover, Seals never indicated that he did not want to talk to Agent Borders or Raiford. (Tr. at 9, 59-60).

[11] Additionally, Agent Borders discussed Seals' background with him, including the fact that Seals was a graduate of Southwest DeKalb High School, had attended college, and had taught in the Gwinnett County school system. (Tr. at 5, 73-74).

5

contacted Louis to notify him that the check had not cleared and that he should not come back to the bank. (Tr. at 12-13). Seals also explained that he ran the check through the treasury system database to ensure that it was valid, but that he did not present the check to his supervisor who should have authorized the deposit in accordance with bank policies. (Tr. at 13-14). At this time, which was approximately 2:00 p.m., Agent Borders asked Seals whether he would sign an affidavit memorializing what he had told him during the interview, and Seals agreed. (Tr. at 14, 22, 41).[12]

Prior to drafting the affidavit, Agent Borders read aloud, and allowed Seals to read for himself, the following statement printed on the Department of Justice affidavit form:

> I make the following statement freely and voluntarily to [Agent Borders] and [Raiford] who are known to me as Special Agents of the United States Department of Justice, Office of the Inspector General, knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to any party who has an official interest.

(Tr. at 15, 17-18, 43-44 & Gov. Ex. 1). The handwritten portion of the affidavit then states:

---

[12] Agent Borders testified that he asked Seals whether he wanted Agent Borders to write the statement rather than writing it himself, explaining that in his experience, "a lot of individuals don't like to write out whatever they're being questioned about," and Seals agreed to allow Agent Borders to draft the statement. (Tr. at 15, 42).

- I have been employed as a sales associate for BestBank since November 2009.
- I am responsible for opening new accounts for customers that come into the bank.
- On or about April 4, 2011, I opened a business account for an individual using the name of Angelo S. Padin. Padin's account was for JD Motor Cars Inc. Angelo Padin opened the account by placing $100 cash into the account.
- Padin gave me an additional $100 in cash at the time he opened the account.
- The $100 was for opening the account for Padin in order for him to come back to deposit a separate check.
- On April 6, 2011, Padin returned to the bank [and] deposited a $60,000 check addressed to the "City of Tuskegee."
- Although I checked the TCIS system to verify the check, I did not present the check to my manager as I should have.
- I have never met or had any dealings [with] Padin before this incident.
- Following the $60,000 deposit, I called Padin on or about the next day to tell him that the check did not clear, [and] that he did not need to come back to the bank. I did not want to be involved in any of his illegal activity.
- I know what I did was wrong [and] I am sorry for my actions.
- I made this statement voluntarily [and] no threats or promises have been made to me.
- I will cooperate [with] law enforcement [and] this investigation if I am requested to in the future.

(Tr. at 15, 43 & Gov. Ex. 1).[13] Additionally, a pre-printed statement on the last page of the affidavit states: "I have read this statement consisting of 3 pages, which was

---

[13] As Agent Borders drafted each bullet point, he asked Seals to review it and confirm whether it was accurate. (Tr. at 14-15, 18). In fact, Seals disagreed with the wording of one of the bullet points on the second page of the affidavit and Agent Borders changed the wording to reflect Seals' own words. (Tr. at 18-19, 78, 86). As Agent Borders drafted the affidavit, Seals read and initialed each page. (Tr. at 15-16, 18, 42 & Gov. Ex. 1).

prepared for me by Special Agent Borders at my request. I have provided this information without having any promises or threats extended to me. It is true and complete to the best of my knowledge and belief." (Tr. at 20 & Gov. Ex. 1). After the affidavit was completed, which was at approximately 3:00 p.m., Agent Borders placed Seals under oath and Seals signed the affidavit.[14] (Tr. at 16-17, 22, 41-42 & Gov Ex. 1). Agent Borders and Raiford also signed the affidavit. (Tr. at 19 & Gov. Ex. 1).

At the time Seals provided this affidavit, he was not under arrest and he had not been threatened, restrained, coerced, or promised anything in return for his statement or his signature on the affidavit.[15] (Tr. at 16, 21-22, 82). Agent Borders was calm and cordial and he never raised his voice or displayed his weapon to Seals.

---

[14] Although Agent Borders and Raiford both testified that Seals was advised at the beginning that the interview was voluntary, see (Tr. at 11-12, 59-60), Seals testified that he was not told of the voluntariness of the interview until the end, (Tr. at 83-84). However, Seals also clearly testified that he read the affidavit, including the pre-printed language regarding the fact that he was making the statement freely and voluntary, prior to signing it. (Tr. at 84). Additionally, at the evidentiary hearing, Seals denied that he was paid $100.00 by Louis for opening the account and denied that he contacted Louis after the check did not clear and told him not to come back to the bank and testified that he only signed the form stating that the statement was true because he "was scared." (Tr. at 86-87).

[15] Seals testified that he thought that he was either going to lose his job or go to jail if he did not sign the affidavit, but he also stated that no one ever told him he would be terminated if he did not agree to talk with Agent Borders or Raiford nor was he told that he was under arrest. (Tr. at 79, 81-83).

(Tr. at 11, 21, 59). During the interview, Seals appeared to understand everything that was being asked of him, he never requested that Agent Borders cease interviewing him or expressed a desire to leave, and no one ever told him he would lose his job if he did not speak with Agent Borders. (Tr. at 21-22, 80, 82). At the conclusion of the interview, all three men left the office and after Raiford gathered all of Seals' personal belongings from the bank, Seals was allowed to leave the premises. (Tr. at 20, 46).[16]

## II. DISCUSSION

Seals seeks to suppress all statements he made on July 15, 2011, contending they were obtained in violation of his Miranda[17] rights. [Doc. 40; Doc. 60 at 4-15]. The government contends that Seals' statements were not the product of a custodial interrogation, and were freely and voluntarily rendered. [Doc. 61 at 8-17].

"*Miranda* warnings are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation." United States v. Adams, 1 F.3d 1566, 1575 (11th Cir. 1993) (citation and internal

---

[16] At this time, Raiford advised Seals that he was suspended pending further notification from Human Resources. (Tr. at 72, 80). After Seals left the premises, Agent Borders and Raiford went into the bank and spoke with the branch manager in order to obtain additional documentation. (Tr. at 20, 27, 46). At this time, Agent Borders also learned that Seals had been reprimanded in April by his bank manager for opening the account in question. (Tr. at 27, 36, 46).

[17] See Miranda v. Arizona, 384 U.S. 436 (1966).

9

marks omitted); see also Miranda, 384 U.S. at 436; United States v. Hampton, Criminal Case No. 1:11–cr–00410–RWS–RGV, 2012 WL 1354579, at *13 (N.D. Ga. Mar. 5, 2012), adopted by 2012 WL 1354574, at *1 (N.D. Ga. Apr. 17, 2012) (quoting United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993)) (alteration in original) (internal marks omitted) ("[T]wo requirements must be met before *Miranda* is applicable; the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.'"). "Custody" for purposes of triggering Miranda advisements occurs when "there has been a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."[18] United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006) (citation and internal marks omitted) (quoting

---

[18] Although Seals argues that he was in custody for purposes of Miranda because a reasonable person in his situation would not have felt free to leave, see [Doc. 60 at 12; Doc. 64 ], the "Supreme Court recently clarified 'that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody,'" United States v. Parker, Criminal Case No. 1:10-CR-0176-JEC-JFK, 2010 WL 5313758, at *8 (N.D. Ga. Nov. 18, 2010), adopted by 2010 WL 5313449, at *1 (N.D. Ga. Dec. 17, 2010) (quoting Maryland v. Shatzer, 130 S.Ct. 1213, 1224 (2010)). In other words, "a 'free-to-leave inquiry reveals *only* whether the person in question was seized.' While 'seizure is a necessary prerequisite to *Miranda*, . . . a court must [also] ask whether . . . a reasonable person would have understood his freedom of action to have been curtailed *to a degree associated with formal arrest.*'" United States v. Luca-Encinas, 603 F.3d 876, 881 (11th Cir. 2010) (alterations in original) (citation omitted). Thus, "the standards are different," and a person is in custody for Miranda purposes only where there is a "restraint on freedom of movement to the degree associated with a formal arrest." United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006) (citations omitted); see also United States v. Cavazos, 668 F.3d 190, 193 (5th Cir. 2012) (citations omitted) ("Custody for *Miranda* purposes requires a greater restraint on freedom than seizure under the Fourth Amendment.").

10

California v. Beheler, 463 U.S. 1121, 1125 (1983)). This determination is made considering the totality of the circumstances, and factors relevant to this determination include but are not limited to "the location of the interview, the existence of any physical restraints such as handcuffs or drawn weapons, whether the suspect asked to leave, the officers' demeanor, the degree of pressure applied to the suspect, and whether the officers brandished weapons, touched the suspect or used language or a tone that indicate that compliance with the officers could be compelled."[19] United States v. Martinez-Leal, Criminal Action No. 1:11-CR-19-TCB-CCH, 2011 WL 3328907, at *15 (N.D. Ga. July 6, 2011), adopted by 2011 WL 3328682, at *3 (N.D. Ga. Aug. 2, 2011) (citations and internal marks omitted); see also United States v. Santos, Criminal Action No. 1:11–CR–259–WBH–CCH, 2012 WL 2061613, at *15 (N.D. Ga. Apr. 24, 2012), adopted by United States v. Hill, Civil Action No. 1:11–CR–0259–WBH, 2012 WL 2062419, at *4 (N.D. Ga. June 7, 2012) (citations omitted).

The standard is objective and the actual subjective beliefs of the defendant and the law enforcement officers involved are irrelevant: custody exists only if a

---

[19] Rather than address the factors that have been established by the Eleventh Circuit for determining whether an individual is in custody for purposes of Miranda, Seals relies on factors set forth by the Eighth Circuit, see [Doc. 60 at 6, 10-13]. While some of these factors overlap, the Court will only address the factors established by Eleventh Circuit precedent.

reasonable person under the same set of circumstances would feel "that his freedom of movement had been restrained to the degree associated with a formal arrest." Martinez-Leal, 2011 WL 3328907, at *15.[20] "Thus, [t]he mere fact that an investigation has focused on a suspect does not trigger the need for Miranda warnings in noncustodial settings." United States v. Dudley, Criminal Case No. 1:10–CR–075–CAP–RGV, 2011 WL 1100607, at *4 (N.D. Ga. Feb. 3, 2011), adopted by 2011 WL 1060659, at *1 (N.D. Ga. Mar. 24, 2011) (alteration in original) (citation and internal marks omitted); see also United States v. Sharma, No. 6:09–CR–1–ORL–19GRJ, 2009 WL 152868, at *6 (M.D. Fla. Jan. 21, 2009), adopted at *1 ("[W]hat the government agents thought or knew about Defendant's situation is wholly irrelevant in the absence of evidence showing that the circumstances were such that a reasonable innocent person would not have felt free to leave."). Seals bears the burden of establishing that he was in custody and that his statements were made in response to government questioning. See United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1977);[21] see also United States v. Asher, Criminal Indictment

---

[20] "[T]he reasonable person from whose perspective 'custody' is defined is a reasonable innocent person." Street, 472 F.3d at 1309 (quoting United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996)).

[21] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

No. 1:09–CR–414–JOF/AJB, 2010 WL 4192883, at *7 (N.D. Ga. Feb. 25, 2010), adopted by 2010 WL 4237579, at *7 (N.D. Ga. Oct. 21, 2010).

Seals' motion to suppress statements, [Doc. 40], is due to be denied because he has not shown that the statements were made under circumstances that were tantamount to an arrest, and he therefore was not in custody for the purposes of Miranda. See Brown, 441 F.3d at 1347. Although Seals contends that he was ordered to speak with Raiford and Agent Borders by his bank superior and that he was afraid he would lose his job if he did not, see [Doc. 60 at 7], considering the totality of the circumstances here, Seals was not in "custody" for purposes of Miranda advisements.[22] During his encounter with Agent Borders and Raiford,

---

[22] Despite the fact that Seals may not have felt that he had a choice in the matter, the fact that he was summoned to the interview by his superior while at work is not dispositive. See United States v. Muegge, 225 F.3d 1267, 1269-71 (11th Cir. 2000) (per curiam). Being ordered to speak with law enforcement by one's employer is not by itself a degree of restraint equivalent to a formal arrest, even where the interview is conducted in a confined room and may result in potential disciplinary action or criminal charges. See Dudley, 2011 WL 1100607, at *5; see also United States v. Mahan, 190 F.3d 416, 422 (6th Cir. 1999) (stating that where defendant was not advised that he was free to leave, "it is simply of no moment that [the defendant] had been summoned to the interview by one of his supervisors at work, or that [the interviewing agent] told him that giving false information during the interview would be a serious matter[;] . . . [n]either fact even remotely constitutes a restraint on the freedom of movement to the degree associated with formal arrest"); United States v. Leese, 176 F.3d 740, 744 (3rd Cir. 1999) (finding defendant not "in custody" where she was ordered to an interview by her employer and investigators informed her that "when the questioning was concluded the inspectors would be returning to Harrisburg and she would not be going with them" even though "[a] significant portion of the questioning was in the typical police

13

Seals was unrestrained in a familiar environment;[23] he was never advised that he was under arrest or that he could or could not leave; and his freedom of movement was not restrained as evidenced by the fact that he was not handcuffed or retrained in any way and was interviewed within an unlocked room.[24] (Tr. at 10-12, 44, 57, 59-

---

interrogation mode, confirming [defendant's] knowledge of Post Office procedures, confronting her with the found discrepancies in her accounts, asking her point blank as to whether she committed the crime, challenging her answers, and attempting to discover the details of the crime"); United States v. Dockery, 736 F.2d 1232, 1234 (8th Cir. 1984) (en banc) (alteration in original) (citation and internal marks omitted) (holding that defendant was not in custody where she "was directed by her employer to meet with the agents" and noting that "[o]rdinarily, when people are at work their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials [sic], but by the workers' voluntary obligations to their employers"). Furthermore, Seals testified that no one told him that he would be terminated from his employment if he did not meet with Agent Borders and Raiford, (Tr. at 79, 81-83), and there is no evidence that there was any sort of an instruction that was "accompanied by any explicit or implicit threat to [Seals'] employment status," Muegge, 225 F.3d at 1271.

[23] Though the exact office where the interview was conducted may not have been familiar to Seals, the general location of the interview, his work premises, was familiar, and "[c]ourts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings," Sharma, 2009 WL 152868, at *8 (citations and internal marks omitted).

[24] Agent Borders and Raiford testified that Seals was seated closest to the door that led out of the office and that he had a clear path to the door, see (Tr. at 10, 44, 58), but even if Seals had to walk past Raiford to leave the interview room and terminate the encounter, see (Tr. at 77), this "does not weigh significantly in favor of finding he was in *Miranda* custody," United Statates v. Demello, No. CR 110–203, 2010 WL 4809088, at *4 (S.D. Ga. Oct. 26, 2010), adopted by 2010 WL 4808526, at *1 (S.D. Ga. Nov. 18, 2010). Indeed, "[i]f a suspect could show custody based on having to walk away from or past interrogating officers in order to leave an interview, then nearly every encounter between a suspect and law enforcement

60, 71, 76-78). Agent Borders never made physical contact with Seals,[25] drew his weapon which was concealed by his clothing, or made any show of force or display of authority beyond identifying himself as an agent, and at the conclusion of the interview, Seals was allowed to leave. (Tr. at 5-6, 9, 11, 16, 20-22, 38, 46, 59-60, 80, 82).

Seals argues that the length of the interrogation weighs in favor of finding that he was in custody. [Doc. 60 at 6-7]. The evidence shows that the interview lasted from sometime after 1:00 p.m., when Agent Borders arrived at the Walmart, to approximately 2:00 pm., when the questioning of Seals ceased and Agent Borders began drafting the affidavit with Seals. (Tr. at 6, 22, 41). It took approximately one hour to draft the affidavit, making the total length of the encounter about 2 hours,

---

would create a custodial situation – a state of affairs that is not consistent with previous case law." Id. (citations omitted).

[25] While there is a discrepancy regarding whether Raiford had his hand on Seals' elbow and actually guided him, without force, through Walmart to the interview office, see (Tr. at 9, 38, 60, 75), it is undisputed that Agent Borders never physically touched Seals prior to or during the interview and that Seals was never physically restrained or threatened in any way during the entire encounter, see (Tr. at 9, 21, 38). Even under Seals' version of events, Raiford's "touching [Seals] briefly to guide him to a specific area . . . could not reasonably suggest to [him] that his . . . interaction with [them] was suddenly compulsory." United States v. Jackson, Criminal No. 09–475, 2011 WL 2580758, at *3 (E.D. Pa. June 28, 2011) (citation omitted). Indeed, assuming Raiford did in fact have his hand on Seals' elbow as they walked to the office, this "touching did not amount to 'a laying on of hands or application of physical force to restrain movement.'" Id. (quoting California v. Hodari D., 499 U.S. 621, 626 (1991)).

(Tr. at 22, 41), which is comparable to or even shorter than the duration of interviews in other cases where courts found there was no requirement that the defendants be advised of their Miranda rights. See United States v. McDowell, 250 F.3d 1354, 1363 (11th Cir. 2001) (noting that "there is no fixed time limit to the length of questioning" and finding four hour interview was not a custodial interrogation); Muegge, 225 F.3d at 1269-71 (finding no custody where defendant was directed by his supervisor to speak with investigators in a secure location where he was interviewed for about two and a half hours and was not formally arrested until almost eight months later); United States v. Manta-Carillo, Criminal No. 11–00103–CB, 2011 WL 3235757, at *2, 4 (S.D. Ala. July 28, 2011) (finding no custody where, among other things, the interview lasted about an hour and a half); Asher, 2010 WL 4192883, at *12 (finding no custody where defendant was detained for about 2 and a half hours but he was only questioned for about 45 minutes).[26]

Additionally, while Seals points out that he was never informed that he was free to leave, both Agent Borders and Raiford testified that Seals was advised

---

[26] "Moreover, the evidence is undisputed that [Agent Borders] interviewed [Seals] in a conversational, non-confrontational manner, the atmosphere was cordial and [Seals] was cooperative," United States v. Damiani, Criminal Action File No. 1:10–CR–519–AT/AJB, 2011 WL 7574628, at *5 (N.D. Ga. Sept. 23, 2011), adopted by 2012 WL 983726, at *1 (N.D. Ga. Mar. 20, 2012) (citations omitted); see also (Tr. at 21, 59), which shows that the "overall tone [of] the interview was not such that it indicated that compliance with the officers would be compelled," Asher, 2010 WL 4192883, at *11 (citation and internal marks omitted).

throughout the course of the interview that it was voluntary.[27] (Tr. at 11-12, 43-44, 59-60 & Gov. Ex. 1). Although Seals testified that he was only told of the voluntariness of the interview at the end, (Tr. at 83-84), he clearly testified that he read the affidavit that contained the pre-printed language explaining that he was making the statement freely and voluntarily prior to signing it, (Tr. at 84). Furthermore, after considering all the testimony, as well as the demeanor and interests of the witnesses, the Court finds that Seals' testimony regarding all of the circumstances surrounding the interview was not fully credible as it was contradicted by the more credible and consistent testimony of Agent Borders and Raiford. See United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004) (recognizing that credibility determinations are within the province of the factfinder). "In making its credibility determination[s], the Court must take into consideration not only the interests of the witness[es], but also 'the internal consistency of the [witnesses'] testimony, or [their] candor or demeanor on the stand.'" United States v. Tyler, No. CR 106-075, 2006 WL 2094538, at *7 (S.D. Ga. July 26, 2006), adopted at *1 (quoting United States v. Ramirez-Chilel, 289 F.3d 744, 749-50 (11th Cir. 2002) (citations omitted)). Therefore, to the extent Seals' testimony

---

[27] Seals also points out that he was never offered a telephone call or a beverage during the interview, see [Doc. 60 at 2]; however, he has not shown that he made any requests during the interview that were denied.

conflicts with Agent Borders and Raiford, the Court finds credible and accepts Agent Borders and Raiford's testimony. This is particularly warranted since Seals actually corroborates much of what Agent Borders and Raiford said about the interview, including admitting that no one ever told him he was under arrest, he was never physically restrained, and that he never indicated that he did not want to talk to them or requested that Agent Borders stop the interview. (Tr. at 82-83).

The circumstances under which Seals spoke with Agent Borders fall far short of the degree of restraint necessary to trigger Miranda advisements. See Yarborough v. Alvarado, 541 U.S. 652, 661 (2004); Oregon v. Mathiason, 429 U.S. 492, 495 (1977); Hampton, 2012 WL 1354579, at *15 (citation and internal marks omitted) ("Lack of arrest is a '[v]ery important' factor weighing against custody."). Indeed, nothing suggests that a reasonable person in Seals' position would not have felt free to terminate the interview at any time and therefore, no Miranda warnings were required prior to Agent Borders' questioning of Seals. See Hampton, 2012 WL 1354579, at *13 (citation and quotation marks omitted); United States v. Augustin, Criminal Case No. 1:11–CR–41–AT–LTW, 2011 WL 5358526, at *3 (N.D. Ga. Aug. 19, 2011), adopted by 2011 WL 5331743, at *5 (N.D. Ga. Nov. 4, 2011). In short, there is simply no evidence that Seals was physically restrained in any manner or that he reasonably felt compelled to stay until the questioning had been completed, and the

Court finds that Seals' freedom of movement was not restrained at any point during the encounter to the degree associated with a formal arrest. See Muegge, 225 F.3d at 1269-71; Martinez-Leal, 2011 WL 3328907, at *17; United States v. Haffner, No. 3:09–cr–337–J–34–TEM, 2010 WL 5296920, at *8 (M.D. Fla. Aug. 31, 2010), adopted by 2010 WL 5296847, at *2 (M.D. Fla. Dec. 20, 2010). Accordingly, under the totality of the circumstances here, Agent Borders was not required to provide Seals with Miranda warnings prior to interviewing him as he was not in custody for purposes of Miranda.

### III. CONCLUSION

For the foregoing reasons and cited authority, it is hereby **RECOMMENDED** that Seals' motion to suppress statements, [Doc. 40], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is not aware of any problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO RECOMMENDED** and **ORDERED**, this 9th day of July, 2012.

*Russell G. Vineyard*
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE